# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

| | |
|---|---|
| **JESSICA WILSON,**<br><br>Plaintiff,<br><br>v.<br><br>**INVESTIGATOR TRACY DEMOND GASKINS and OFFICER KEVIN TROLINGER**,<br><br>Defendants. | Civil Action No. 7:18-CV-108 (HL) |

## ORDER

This case arises out of the August 30, 2017 arrest of Plaintiff Jessica Wilson for obstruction of a law enforcement officer. Presently pending before the Court is Defendants Tracy Demond Gaskins and Kevin Trolinger's Motion for Summary Judgment. (Doc. 8). After reviewing the pleadings, briefs, affidavits, and other evidentiary materials presented, the Court concludes that Defendants are entitled to qualified and official immunity and GRANTS Defendants' motion.

## I.  FACTUAL BACKGROUND

On August 30, 2017, Defendants Investigator Tracy Demond Gaskins and Officer Kevin Trolinger, who are employed by the City of Quitman Police Department, arrived at 838 East Lafayette Street, the home of Plaintiff Jessica

Wilson, to serve a Brooks County arrest warrant. (DSOMF ¶ 1).[1] Wilson met the officers at the front door and asked why they were at her home. (Id. at ¶¶ 2-3). Trolinger inquired whether Wilson son Keldrick Virgil was home and requested that Wilson summon him to the door. (Id. at ¶ 4). Wilson called into the house for her son. (Id. at ¶ 5). A young man then arrived at the door and identified himself as Keldrick Virgil. (Id. at ¶ 6). Virgil was wearing neither a shirt nor shoes. (Id. at ¶ 7).

Trolinger verified Virgil's date of birth and explained that he and the other officers were present to serve an arrest warrant issued by Brooks County for Virgil. (Id. at ¶¶ 8-9). Wilson then turned to Gaskins and asked why Brooks County issued a warrant for her son's arrest. (Id. at ¶ 10). Gaskins responded, "All I can tell you is they got a warrant for your arrest." (Id. ¶ 11). Trolinger stated that he believed that the warrant may be for disruption of a public school, to which Wilson responded that her son had just been suspended from school the day before. (Ex. B, 11:17:00 – 11:17:11; DSOMF ¶ 13). During this interchange, Virgil slowly backed away from the doorway and out of the view of Tolinger's body camera. (DSOMF ¶ 12).

---

[1] "DSOMF" refers to Defendants' Statement of Material Facts. (Doc. 8-2). The cited paragraphs are those admitted by Plaintiff. DSOMF is supported primarily by the body camera footage taken by Defendant Trolinger on the date in question, a copy of which was provided to the Court in CD format as Exhibit B to Defendants' motion and uploaded to the Digital Evidence Vault. (Doc. 10).

Trolinger requested that Wilson have her son put on some shoes. (Id. at ¶ 15). As she walked into the house, Wilson called to her son, "Put your shoes on baby, come on." (Id. at ¶ 16). Gaskins followed Wilson up the front stairs of the house and into the entryway of the home. (Id. at ¶ 17). Wilson told Gaskins, "He's coming, you don't gotta come in, he's coming . . . he's coming, he's coming, he's coming." (Id. at ¶ 18).[2]

Moments later, Trolinger entered the house. (Id. at ¶ 20). It is apparent that when Trolinger entered the living area of the home that the back door of the house was already cracked open. (Id. ¶ 22). Wilson continued to argue with Gaskins about the basis for the arrest warrant. (Ex. B, 11:18:10 – 11:18:22). During the interchange between Wilson and Gaskins, Wilson was on the phone. (DSOMF ¶ 23). She walked away from the officers toward the back door. (Id.). Wilson opened the door and looked outside, then walked back toward the officers, leaving the door ajar. (Id. at ¶¶ 24-25). Wilson told the officers, "This is some bull right here – he was just at school yesterday, they just suspended him yesterday." (Id. at ¶ 26).

The officers permitted Wilson to speak with someone at the school. (Id. at ¶ 28). While Wilson was still on the phone, Gaskins asked, "Where's he at?" (Id.

---

[2] The Court agrees with Plaintiff that audio of any statement she might have made at this point is not clear on the video recording. However, Plaintiff admits that she told the officer that her son was coming. (Doc. 12-1, ¶ 18).

at ¶ 29). Wilson nonchalantly replied, "He left, I think." (Id. at ¶ 30). Gaskins then stated, "Well then let's go ahead and book her up." (Id. at ¶ 33). Wilson calmly walked toward the back door where she exclaimed, "He ran out the back door!" (Ex. B, 11:19:25 – 11:19:30). Wilson declared, "When he came in the house, he went out the back door." (DSOMF ¶ 35). Trolinger responded to Plaintiff, "And when Investigator Gaskins tried to come in the house, you said he don't need to come in here." (Id. at ¶ 36). Wilson protested, saying, "When I came in the house, Keldrick was already out the back door. The door was cracked." (Id. at ¶ 37).

Wilson then contacted her mother, and the officers instructed her to put on her shoes. (Ex. B, 11:19:48 – 11:20:08). Trolinger placed Wilson in handcuffs. (DSOMF ¶ 40). As the officers escorted Wilson out of the house and into the patrol car, she continued to shout profanities and threatened a lawsuit. (Id. at ¶ 41). Trolinger transported Wilson to the Brooks County Detention Center where she was cited for misdemeanor obstruction of a law enforcement officer in violation of O.C.G.A. § 16-10-24. (Id. at ¶¶ 42-43; Doc. 1-2). Wilson was later found not guilty of the offense. (Doc. 1-3). This lawsuit followed.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter

4

of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex, 477 U.S. at 323 (internal quotation omitted). If the movant meets this burden, the burden shifts to the party opposing summary judgment to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law. Id. at 324-26. This evidence must consist of more than conclusory allegations. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Summary judgment shall be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those

facts." Scott v. Harris, 550 U.S. 372, 380 (2007). However, when, as in this case, reliable video evidence is available, the court should view the facts in the light depicted by the video recording. Id. at 381; see also Penley v. Eslinger, 605 F.3d 843, 848 (11th Cir. 2010) (inferences for the nonmoving party may be drawn only "to the extent supportable by the record").

## III. DISCUSSION

Plaintiff asserts claims against Defendants under 42 U.S.C. § 1983 for false arrest and malicious prosecution and under Georgia law for false imprisonment and malicious prosecution. Defendants argue that because they had probable cause, or at least arguable probable cause, to arrest Plaintiff for misdemeanor obstruction of a law enforcement officer, they are entitled to the protections of qualified immunity in relation to Plaintiff's claims raised under federal law. Defendants further contend that absent evidence of actual malice, they are shielded by official immunity against Plaintiff's state law claims. Plaintiff concedes that the existence of probable cause is an absolute bar to her § 1983 claims. (Doc. 12, p. 4). However, she maintains that the officers lacked probable cause to believe that she knowingly or willfully obstructed any law enforcement officer and that they pursued her arrest and prosecution with actual malice.

### A. Qualified Immunity

#### 1. General Principles

"A government official who is sued under § 1983 may seek summary judgment on the ground that he is entitled to qualified immunity." Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004). Qualified immunity offers complete protection for government officials sued in their individual capacities "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Accordingly, qualified immunity "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (internal quotation marks omitted).

To receive qualified immunity, the official first must "prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted). Here, there is no dispute that Defendants were acting within their discretionary authority when they arrested Plaintiff. See Crosby, 394

F.3d at 1332 ("making an arrest is within the official responsibilities of a sheriff's deputy"); Wood v. Kessler, 323 F.3d 872, 877 (11th Cir. 2003) (concluding that a state trooper was clearly acting within the scope of his discretionary authority when he charged and arrested the plaintiff). Once the official establishes that he was engaged in a "discretionary function," the burden shifts to the plaintiff "to show that the defendant is not entitled to qualified immunity." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004) (emphasis in original). To demonstrate that the official is not entitled to qualified immunity, the plaintiff must show (1) that the official violated a constitutional right; and (2) that the constitutional right violated was "clearly established" at the time of the alleged violation. Saucier v. Katz, 533 U.S. 194, 201 (2001); Holloman, 370 F.3d at 1264.

### 2. False Arrest

Plaintiff alleges that Defendants are not entitled to the protections of qualified immunity for her § 1983 false arrest claim because they lacked probable cause for her arrest. Under the Fourth Amendment, an individual has a right to be free from "unreasonable searches and seizures." An arrest is a seizure, and the "reasonableness" of an arrest is "determined by the presence or absence of probable cause for the arrest." Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1136 (11th Cir. 2007). "A warrantless arrest without probable cause violates the Constitution and provides a basis for a section 1983 claim[;]" however, "[t]he

existence of probable cause at the time of arrest . . . constitutes an absolute bar to a section 1983 action for false arrest." Kingsland v. City of Miami, 382 F.3d 1220, 1226 (11th Cir. 2004).

"In order to establish probable cause, an arrest must be objectively reasonable based on the totality of the circumstances." Manners v. Cannella, 891 F.3d 959, 968 (11th Cir. 2018) (quotation marks and citation omitted). An arrest is objectively reasonable, and probable cause to arrest exists, when "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Id. (quoting Williamson v. Mills, 65 F.3d 155, 158 (11th Cir. 1995)). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983).

"We do not automatically hold an officer liable for making an arrest that, when seen with the benefit of hindsight, turns out not to have been supported by probable cause." Skop, 485 F.3d at 1137 (citing Anderson v. Creighton, 483 U.S. 635, 641 (1987) (observing that "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials . . . should not

be held personally liable")). Therefore, to receive qualified immunity protection, "an officer need not have actual probable cause but only 'arguable probable cause.'" Wood, 323 F.3d at 878 (quoting Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997)). The proper inquiry "is not whether probable cause actually existed, but instead whether an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed." Id.; see also Grider v. City of Auburn, 618 F.3d 1240, 1257 (11th Cir. 2010) (arguable probable cause means that "reasonable officers in the same circumstances and possessing the same knowledge as the [d]efendants could have believed that probable cause existed to arrest the [p]laintiff"). "This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who unreasonably conclude that probable cause exists." Skop, 485 F.3d at 1137 (emphasis in original).

Whether an arresting officer possesses probable cause or arguable probable cause "to justify an arrest for a particular crime depends, of course, on the elements of the crime." Crosby, 394 F.3d at 1333. Georgia law provides that "a person who knowingly and willfully obstructs or hinders any law enforcement officer . . . in the lawful discharge of his or her official duties shall be guilty of a misdemeanor." O.C.G.A. § 16-10-24(a). The misdemeanor obstruction statute

"was made purposefully broad to cover actions which might not be otherwise unlawful, but which obstructed or hindered law enforcement officers in carrying out their duties. This does not, however, make any actions which incidentally hinder an officer a crime." Hudson v. State, 135 Ga. App. 739, 742 (1975).

Georgia courts have determined that a variety of conduct satisfies the element of obstructing or hindering. Harris v. State, 314 Ga. App. 816, 820 (2012) (noting that deceiving an officer or interfering with an officer's interview of a reporting party may be sufficient to qualify as obstruction); Panzner v. State, 273 Ga. App. 868, 869 (2005) ("Obstruction of the police in performing their lawful duty includes any act that directly interferes with, impedes, interrupts, or perverts the public administration of justice."); Pinchon v. State, 237 Ga. App. 675 (1999) ("Argument, flight, stubborn obstinance, and lying are all examples of conduct that may satisfy the obstruction element."); Duke v. State, 205 Ga. App. 689, 689-90 (1992) ("lying with the intent of misdirecting [an officer] as to the performance of his official duties can certainly constitute a hinderance and authorize a misdemeanor conviction" for obstruction).

There is no dispute that Defendants were lawfully present at Plaintiff's home on August 30, 2017, to execute a valid arrest warrant and that they properly identified themselves and the purpose for their presence. The undisputed evidence as portrayed in Defendant Trolinger's body camera footage

further shows that after Defendants initially make contact with Keldrick Virgil and notify him of the arrest warrant, Virgil withdraws from the doorway and the view of the camera. Plaintiff then continues to address the officers and to argue with them about the purpose of the warrant. When Defendants request that Plaintiff instruct her son to put on his shoes, she complies. However, as she turns to walk into the house, she tells Defendant Gaskins that he need not follow her because her son is coming.

On the video, Gaskins can be observed following Plaintiff into the house, with Trolinger only moments behind him. When the parties move from the front door into the main living area of the home, Plaintiff's argument with Defendants does not cease. As Plaintiff continues her debate, she can clearly be seen walking directly to the back door, which is visibly cracked open. She then opens the door and looks outside before walking back toward Defendants. During this time, Plaintiff is on the telephone, purportedly contacting her son's school. Defendants permit her to make the call. However, Defendants soon realize that Virgil has not returned with his shoes and inquire where he is. Plaintiff then responds, without any seeming surprise, that Virgil left the house. It is evident both from her physical actions and her statements that Plaintiff knew that her son had left the house through the back door prior to the officers' entry into the home.

Viewing the facts in the light depicted in the video recording, the Court believes that Defendants had actual probable cause to arrest Plaintiff for obstruction. But, even if Defendants lacked actual probable cause, the Court concludes that the officers clearly had arguable probable cause for the arrest. Based on the totality of the circumstances confronted by Defendants, a reasonable officer in similar circumstances possessing similar knowledge could conclude that Plaintiff intentionally hindered the execution of the search warrant on her son by attempting to delay the officer's entry into the home and engaging them in a continued argument so as to permit her son time to flee the premises and to avoid arrest.

Plaintiff argues that Defendants lacked even arguable probable cause because Defendants have not established that she knowingly or willfully obstructed or hindered her son's arrest. But the Eleventh Circuit repeatedly has held that "[s]howing arguable probable cause does not . . . require proving every element of a crime." Gates v. Khokhar, 884 F.3d 1290, 1300 (11th Cir. 2018) (quoting Brown v. City of Huntsville Ala., 608 F.3d 724, 735 (11th Cir. 2010)) (internal quotation marks omitted). "To require an arresting officer to prove every element of a crime would negate the concept of probable cause and transform arresting officers into prosecutors." Id. (quoting Lee, 284 F.3d at 1195) (internal quotation marks omitted). More particularly, the Eleventh Circuit has "never

pronounced a rigid requirement that an arresting officer must have specific evidence of the subjective intent and knowledge of a subject beyond the subject's conduct that otherwise gives rise to probable cause to arrest. In fact, [the Court has] acknowledged that no police officer can truly know another person's subjective intent." Id. (quoting Jordan v. Mosley, 487 F.3d 1350, 1355 (11th Cir. 2007)) (internal quotation marks omitted).

Here, the video evidence is clear that Plaintiff knew her son was no longer in the house once Defendants entered the home. Rather than notify the officers that her son left through the back door, she persisted with her argument and continued to delay the proceedings by making telephone calls to inquire about the basis for the arrest warrant. Whether or not Plaintiff actually had the subjective intent to hinder the arrest of her son is irrelevant to the arguable probable cause analysis. The evidence need only show that a reasonable officer could have believed under the circumstances that Plaintiff was intentionally interfering in the execution of the arrest warrant, which it undoubtedly does.

Finding that Defendants, at the very least, had arguable probable cause to arrest Plaintiff for obstruction of a law enforcement officer, the Court concludes that Defendants are entitled to qualified immunity and that summary judgment is appropriate on Plaintiff's § 1983 claim for false arrest.

### 3. Malicious Prosecution

To recover for a § 1983 malicious prosecution claim, a plaintiff must show "(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." Kjellsen v. Mills, 517 F.3d 1232, 1237 (11th Cir. 2008) (internal quotation marks omitted). The presence of probable cause "defeats a claim of malicious prosecution." Black v. Wigington, 811 F.3d 1259, 1267 (11th Cir. 2016). As discussed above, Defendants had probable cause to arrest Plaintiff. Accordingly, Defendants are entitled to summary judgment on Plaintiff's § 1983 malicious prosecution claim.

### B. Official Immunity

Plaintiff has alleged state law claims for false imprisonment under O.C.G.A. § 51-7-20 and for malicious prosecution under O.C.G.A. § 51-7-40. Defendants contend that they are entitled to official immunity as to each of Plaintiff's state law claims. The Court agrees.

The doctrine of official immunity "offers public officers and employees limited protection from suit in their personal capacity." Cameron v. Lang, 274 Ga. 122, 123 (2001). A suit against a governmental employee sued in his individual capacity "is barred by official immunity where the public official has engaged in discretionary acts that are within the scope of his or her authority, and the official

has not acted in a willful or wanton manner; with actual malice; or with the actual intent to cause injury." Brown v. Penland Constr. Co., 281 Ga. 625, 625-26 (2007); see also Ga. Const. of 1983, Art. I, Sec. II, Par. IX(d). Under Georgia law, the decision to make a warrantless arrest "is considered a discretionary act within the scope of the officer's official functions." Mercado v. Swoope, 340 Ga. App. 647, 650 (2017). Because there is no dispute that Defendants were acting within their discretionary authority when they arrested Plaintiff, the burden then shifts to Plaintiff to show that Defendants acted with actual malice. See Adams v. Hazelwood, 271 Ga. 414 (1999).

In the context of official immunity, "actual malice" requires "a deliberate intention to do wrong." Bateast v. DeKalb County, 258 Ga. App. 131, 132 (2002). A "deliberate intention to do wrong" means "the intent to cause the harm suffered by the plaintiff[ ]." Murphy v. Bajjani, 282 Ga. 197, 203 (2007). Similarly, "actual intent to cause injury" requires "an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury." Kidd v. Coates, 271 Ga. 33 (1999). "Even when an arresting officer operates on a mistaken belief that an arrest is appropriate, official immunity still applies." Selvy v. Morrison, 292 Ga. App. 702, 706 n.17 (2008). "Our task is not to decide, with the benefit of hindsight, what the officers should have done. We are concerned

only with whether their behavior showed a deliberate intent to commit a wrongful act." Id. at 707.

Plaintiff has pointed to no evidence that Defendants acted with actual malice with the intent to cause her harm. In her affidavit, Plaintiff states that "Investigator Gaskins has expressed malice and dislike for me on a number of occasions." (Doc. 12-3, p. 4). She further explains that she has "had problems with [Gaskins] since Keldrick was 14 years old. He is always blaming Keldrick for something, and he and I have argued about Keldrick many times." (Id.). According to Plaintiff, following her arrest, Gaskins told her that he would make her life "a living hell," and during the court proceedings, he "pointed his finger at [her] like he was firing a gun and said, 'I got you.'" (Id.). He also referred to her as a "bitch" and a "powder headed bitch." (Id.). And, finally, after the birth of Plaintiff's grandchild, Gaskins allegedly left a bad report concerning Plaintiff's son, the father of the child, with the Brooks County Department of Family and Children Services. (Id. at p. 5). Plaintiff asserts no specific allegations of malice in relation to Defendant Trolinger.

Taking Plaintiff's allegations against Defendant Gaskins as true, Plaintiff still has not demonstrated actual malice. "Actual malice requires more than harboring bad feelings about another." Adams, 271 Ga. at 415. While "ill will," to which Gaskins's alleged conduct most reasonably equates, may contribute to a

finding of actual malice, "its presence alone cannot pierce official immunity; rather, ill will must also be combined with the intent to do something wrongful or illegal." Id. "To hold otherwise would mean that any plaintiff who suffers damages as the result of an act of a public officer or employee can pierce . . . official immunity solely on the basis of the defendant's rancorous personal feelings towards the plaintiff, even though the defendant's actions in regard to the disliked plaintiff may have been completely lawful and legally justified." Id.

Despite any potential personal or negative feelings Gaskins may have harbored toward Plaintiff, there is no evidence that in arresting Plaintiff either Gaskins or Trolinger acted with any deliberate intention to do wrong. Accordingly, the Court finds that Defendants are entitled to official immunity and grants summary judgment as to Plaintiff's state law claims.

### C. Punitive Damages and Attorneys' Fees

Defendants also move for summary judgment on Plaintiff's prayer for punitive damages and attorneys' fees. Having concluded that Defendants are entitled to qualified immunity as to Plaintiff's § 1983 claims and official immunity as to Plaintiff's state law claims, Plaintiff's claims for punitive damages and attorneys' fees fail as a matter of law.

## VI. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment. (Doc. 8).

**SO ORDERED**, this the 20th day of March, 2019.

*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

aks